

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00115-CR
No. 02-19-00116-CR
No. 02-19-00117-CR
No. 02-19-00118-CR

_____

ALLEN DEWAYNE THOMAS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 415th District Court
Parker County, Texas
Trial Court Nos. CR17-0400, CR17-0401, CR17-0402, CR17-0403

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

In four indictments, the State alleged that Allen Dewayne Thomas committed four instances of aggravated assault against four different public servants while using or exhibiting a deadly weapon—a firearm. *See* Tex. Penal Code Ann. § 22.02(a)(2), (b)(2)(B). Without the benefit of any type of plea bargain, Thomas pleaded guilty to all four counts and signed judicial confessions. At a later hearing, the trial court found Thomas guilty of the four offenses and sentenced him to 70 years' confinement for each one. The judgments show that the sentences are running concurrently.

Thomas appealed each of the convictions. In a single brief, he raises the same three points attacking all four: (1) the evidence is insufficient to support his guilty pleas, (2) the trial court abused its discretion by not allowing him to withdraw his guilty pleas because they were involuntary, and (3) the trial court abused its discretion by not allowing him to withdraw his guilty pleas because he was not competent to stand trial. We affirm.

## Sufficient evidence supports Thomas's pleas.

In his first point, Thomas argues that Article 1.15 of the Texas Code of Criminal Procedure requires that sufficient evidence support guilty pleas and that in his four cases, the State failed to produce sufficient evidentiary support. *See* Tex. Code Crim. Proc. Ann. art. 1.15.[1] We disagree.

---

[1]In pertinent part, Article 1.15 provides:

Thomas correctly cites the law: Article 1.15 provides that a defendant cannot be convicted on a guilty plea without sufficient evidence to support it. *See id.* But Thomas incorrectly asserts that his guilty pleas lack the requisite evidentiary support.

In all four cases, Thomas signed written confessions admitting that he committed the offenses as alleged in the respective indictments. In each of those confessions, Thomas specifically asked "that the Court consider th[e] document as [his] judicial confession and as evidence supporting [his] plea in th[e] cause." In each instance, defense counsel and the prosecutor both signed Thomas's paperwork and both requested "that the Court consider th[e] document as evidence supporting [Thomas's] plea in th[e] cause." Finally, for each case, the trial court approved Thomas's judicial confession, wrote that Thomas's confession was "hereby considered as evidence in this cause," ordered the document filed, and signed it.

When taking Thomas's pleas in February 2019, the trial court referred to documents that in context could have only been the paperwork containing his judicial confessions:

---

[I]n no event shall a person charged be convicted upon his plea without sufficient evidence to support the same. The evidence may be stipulated if the defendant in such case consents in writing, in open court, to waive the appearance, confrontation, and cross-examination of witnesses, and further consents either to an oral stipulation of the evidence and testimony or to the introduction of testimony by affidavits, written statements of witnesses, and any other documentary evidence in support of the judgment of the court. Such waiver and consent must be approved by the court in writing[] and be filed in the file of the papers of the cause.

Tex. Code Crim. Proc. Ann. art. 1.15.

THE COURT: You're charged with aggravated assault against a public servant in four cases. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Had plenty of time to talk to your lawyer about each?

THE DEFENDANT: Yes, sir.

THE COURT: Sign one of these documents in each case?

THE DEFENDANT: Yes, sir.

THE COURT: Voluntarily?

THE DEFENDANT: Yes, sir.

THE COURT: By signing, you will not have a trial, you will not have a jury. Is that what you want?

THE DEFENDANT: Yes, sir.

THE COURT: Also by signing, you're basically admitting you engaged in the conduct the state alleged. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Feel like you know what the deal is on these cases?

THE DEFENDANT: Yes, sir.

THE COURT: I'll accept each waiver. What is your plea in each?

THE DEFENDANT: Guilty, sir.

THE COURT: Are you pleading guilty because you are?

THE DEFENDANT: Yes, sir.

THE COURT: You enter each plea voluntarily?

THE DEFENDANT: Yes, sir[.]

THE COURT: I will accept the pleas.

Evidence that the parties treat as admitted is deemed to have been admitted. *See Killion v. State*, 503 S.W.2d 765, 766 (Tex. Crim. App. 1973); *Rexford v. State*, 818 S.W.2d 494, 495–96 (Tex. App.—Houston [1st Dist.]), *pet. ref'd*, 823 S.W.2d 296 (Tex. Crim. App. 1991); *see also Pitts v. State*, 916 S.W.2d 507, 509–10 (Tex. Crim. App. 1996). Here, the record shows that the trial court relied on Thomas's judicial confessions when accepting his pleas. *See Killion*, 503 S.W.2d at 766.

Nor do we have to rely strictly on his confessions. A detailed discussion of the offenses appears in the "Report of Insanity Evaluation," which the trial court admitted into evidence and took judicial notice of. The trial court also heard testimony in March 2019 from four deputies and Thomas.

The events of April 1, 2017, started when Thomas called 911 at 6:11 a.m. to report that he had shot two people who had trespassed on his property.

The sheriff's office already had Thomas flagged as dangerous in what they referred to as a "premises file." About five weeks earlier, he had threatened law enforcement after officers responded to a complaint about a loud party and gunshots coming from his property. Thomas had purportedly told officers that "the next time police came to his property he could put two in their head."

At the March 2019 hearing, all four deputies who had responded to Thomas's 911 call recounted their concerns. Sergeant Richard Crosley II feared that they might be walking into an ambush. Deputy Makyla Campbell stated that the officers thought

5

the call was odd and "didn't feel right." Because Thomas had reported that he had already shot some trespassers, Corporal Daniel Britton stated that they wanted to get to Thomas before he shot at anyone else. And Deputy Jeremy Tharp acknowledged that they knew of past threats to law enforcement and that the situation might be dangerous.

In three marked patrol vehicles, the four deputies responded to Thomas's call and proceeded to his residence. Not wanting to become targets, they turned their vehicles' lights off before arriving. Deputy Campbell described the area as heavily wooded; from the street, she could not see any houses. Thomas himself described the location as being in the country, on a river, and very densely wooded. At that hour, the sun was just coming up. Corporal Britton described it as a "low-light situation" and as "still pretty dark."

Encountering multiple long driveways—each extending about two-tenths of a mile—the deputies stopped in the roadway and got out of their patrol cars to get their bearings. While they were discussing which driveway to choose, two shots rang out and two bullets hit Sergeant Crosley's patrol car. The deputies dropped to the ground or took cover. The shooter remained out of sight, although Sergeant Crosley was able to determine that the shots were coming from Thomas's property. After a third shot hit Sergeant Crosley's patrol car, the deputies still were not able to see the shooter, so they decided to fall back. From the first bend about 200 yards down the roadway, they

6

radioed for SWAT (special weapons and tactics) to assist them. Sergeant Crosley heard additional shots but had no idea whom they were aimed at or where they went.

At some point after the deputies had retreated, Thomas's girlfriend left his residence and encountered various deputies. She later told law enforcement that Thomas—while holding two rifles and wearing netting draped over him—had awakened her that morning, told her that he had shot two trespassers and two deputies, and instructed her to leave because a gunfight was about to start.

At 7:52 a.m., Thomas sent a text to his cousin and others saying that he was "[a]bout to be famous." On Thomas's phone, which law enforcement later recovered, were texts showing that Thomas thought that he had shot a deputy, that he was going to be on the news, and that he wanted his children to divide up his belongings among them.

About 30 minutes after being called, SWAT arrived and drove their large tactical vehicle up to the front gate to Thomas's driveway. A spotter from the vehicle saw Thomas with a rifle; he was screaming, "Come and get me." The tactical vehicle then broke through the gate and went down the driveway. Sergeant Crosley saw Thomas retreating into a carport. Turning around to face Sergeant Crosley, Thomas then put his hands in the air and said, "Bring it on, chubby." When the deputies told Thomas to get on the ground, he did not comply, so one of them tackled Thomas, who resisted and tried to punch the deputies. No one else was found on the property.

Although on the 911 call Thomas reported having shot two people, the deputies did not find anyone wounded or dead and did not see any blood from someone who had been wounded.

At the March 2019 hearing, Thomas testified but could provide little help explaining why he had lured deputies to his residence only to open fire on them. He stated that he did not remember anything that had happened: "I remember calling 911, and I remember waking up in Parker County Jail a couple months later, and that's the God's honest truth." Thomas's shooting at law enforcement dumbfounded him:

> Honestly, gentleman and ladies, I really, truthfully, don't remember anything that happened that day. I do not. And there's—I would never intentionally put y'all in harm's way, because I know what it is to go into harm's way, and I've been there several times. And I'm truthfully sorry, but I did not intentionally try to shoot at anyone of y'all. I was afraid for my life out there that day. And I don't know how many times I've had people trespass on that property, and [I] wake up in the middle of the night to gunfire or in the morning to gunfire,[2] but I would never intentionally shoot a police officer. I have too much respect for what y'all do.

Despite not recalling the events, Thomas acknowledged that he had pleaded guilty because overwhelming evidence showed that he was the shooter.

The psychologist who evaluated Thomas concluded that he "did not meet the legal criteria for not guilty by reason of insanity . . . when he shot at four public

---

[2]Hunters would come onto Thomas's property. Thomas stated that he had called the police to complain about gunshots three or four times.

servants." On the other hand, the psychologist noted that "Thomas may have been experiencing a mental disease or defect, but it is difficult to tell based on the lack of corroboration."

For example, in the Insanity Evaluation, the psychologist noted that Thomas had mental issues dating from the time of his Marine service, which spanned from 1987 until 1999. While in the Marines, Thomas had served in Desert Shield, Desert Storm, Albania, Somalia, and Haiti and had reached the rank of captain. He had been diagnosed with bipolar disorder and post-traumatic stress disorder, and he had reported having received a head injury while in the military in 1993 and later—starting in 1994 or 1995—suffering from short-term memory loss. Evaluated at a naval hospital, Thomas heard from doctors that they could do nothing for him. After medically retiring because of his brain injury and after being honorably discharged (apparently despite receiving a disciplinary case for fighting), Thomas managed a production plant for General Electric in Kansas and then worked as a senior vice president at an oil-well company in Austin for 15 years until his memory deteriorated; although Thomas tried to conceal his failing memory, he was eventually fired. He last worked in May 2016.

Thomas had lived in a 5,000 square-foot house in Leander, Texas, that he had paid off by the time he was 38 years old. He moved to Parker County "to be left alone" and stated, "The best thing for me is [to] live in the middle of nowhere so I don't kill anybody."

Alcohol consumption appeared repeatedly in the evaluation. Thomas's girlfriend stated that he "continually stay[ed] drunk" and that he "drank whiskey 'most of the night.'" Thomas's cousin, who had been at Thomas's residence until 3:00 a.m. the morning of the offenses, asserted that Thomas had not been "drinking as much as usual." And when a Ranger interviewed Thomas well into the lunch hour that day, the Ranger reported smelling alcohol on Thomas's breath. Thomas admitted "being a full-blown alcoholic before the offense" and asserted that he would drink a 12-pack of beer and have eight to ten shots of hard liquor every day, including the day of the offenses. Indeed, the evaluation concludes that whether Thomas was "experiencing a mental disease or defect" at the time was speculative, but whether he was voluntarily intoxicated was not.

Thomas also reported having been served with divorce papers three days before the offenses occurred; the divorce angered and frustrated Thomas, who told the trial court that he was ordered to reimburse $700,000 to the marital estate. He had been married over 20 years and had three children with whom he no longer had any contact.

Between Thomas's judicial confessions, the Insanity Evaluation, and the testimony presented at the March 2019 hearing, the evidence supporting Thomas's guilty pleas suffices. *See* Tex. Code Crim. Proc. Ann. art. 1.15. Regardless of what Thomas himself remembered, the evidence showed that

- Thomas called 911;

10

- deputies responded to Thomas's 911 call;

- when the deputies arrived, Thomas immediately began shooting at them even before they had entered his property;

- Thomas was aware that he was shooting at deputies as shown by (1) what he had told his girlfriend, (2) what he had texted, and (3) his 911 call, which was certain to bring deputies to his residence;

- based on the absence of any wounded or dead trespassers, Thomas had used the 911 call to set up an ambush; and

- intoxication, anger and frustration fueled by his divorce, and mental disorders that did not rise to the level of insanity likely played roles in Thomas's conduct that morning.

We overrule Thomas's first point.

## The trial court did not abuse its discretion by not letting Thomas withdraw his guilty pleas.

In Thomas's second and third points, he contends that the trial court abused its discretion by not allowing him to withdraw his guilty pleas because they were involuntary and because he was not competent to stand trial.

A "defendant may withdraw his guilty plea as a matter of right without assigning reason until . . . judgment has been pronounced or the case has been taken under advisement." *Jackson v. State*, 590 S.W.2d 514, 515 (Tex. Crim. App. [Panel Op.] 1979). But after the court takes the case under advisement, any withdrawal is within the trial court's sound discretion. *Id.*

11

Thomas concedes that when he tried to withdraw his pleas, the trial court had already taken his cases under advisement. *See id.* He thus acknowledges that he must—and argues that he can—show that the trial court abused its discretion.

Under an abuse-of-discretion standard, provided the trial court's ruling falls within the zone of reasonable disagreement, appellate courts will not intercede. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op on reh'g). Appellate deference is intended to avoid the anomaly of having appellate courts usurp a function that the system assigns to the trial courts. *Id.* at 392. The abuse-of-discretion standard is a rule of appellate-court restraint. *Id.* Consistent with that deferential standard, appellate courts review the facts in the light most favorable to the trial court's ruling. *See Ex parte McIntyre*, 558 S.W.3d 295, 299 (Tex. App.—Fort Worth 2018, pet. ref'd).

At the end of the March 2019 hearing, after defense counsel and the prosecutor had each presented their closing arguments, the trial court and Thomas engaged in a dialogue during which Thomas appeared confused, waffled on what he wanted, and took inconsistent positions. This flip-flopping dialogue between the trial court and Thomas forms the basis of Thomas's second and third points. Although lengthy, we present it in its entirety:

> THE COURT: Before we move any further, I would ask Defendant and Counsel to stand, please. Court notes that its inquiring of the defendant when testifying was whether he believed the testimony of the officers in the trial today, and he indicated the affirmative to that inquiry.

The Court will now inquire of Mr. Thomas, reminding you, Mr. Thomas, that you're still under oath, that you signed a waiver of a jury trial back in the first week of February of this year; is that right?

THE DEFENDANT: Yes, sir.

THE COURT: You remember doing that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. How many cases do you think you have pending here today? How many cases are we dealing with against you? And I'm—I'm just asking you if you know.

THE DEFENDANT: Four, sir.

THE COURT: Okay. And, accordingly, you signed a waiver of jury trial in each one of those cases, correct?

THE DEFENDANT: Yes, sir.

THE COURT: And when I say "waiver of jury trial[,"] what does that mean to you?

THE DEFENDANT: Means trial by a judge, sir.

THE COURT: Okay. And with regard to the right to a jury trial, what's your understanding of that right?

THE DEFENDANT: That I have a right to be tried by my peers.

THE COURT: All right. He also told me back in February that you've signed each one of these waivers voluntarily. Do you stand on that today?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. So nobody made you sign these?

THE DEFENDANT: No, sir.

THE COURT: At that point in time the Court accepted each one of those waivers and, accordingly, determined you would not have a jury trial. You realize that, don't you?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Subsequent to the Court accepting those things, you then entered a plea with regard to each one of these four cases. Do you recall doing that?

THE DEFENDANT: Yes, sir.

THE COURT: And your plea was what?

THE DEFENDANT: Guilty, sir.

THE COURT: And so you indicated guilt on each and every one, right?

THE DEFENDANT: Yes, sir.

THE COURT: And you told me that voluntarily, correct?

THE DEFENDANT: Yes, sir.

THE COURT: Furthermore, you told me that you were guilty for each one of those because you believed that to be true; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. The Court accepted each one of those pleas—I'll tell you I did—and my inquiry of you now is whether you persist in your plea of guilty and stand on your plea of guilty with regard to each one of these cases?

THE DEFENDANT: No, sir.

THE COURT: You don't?

THE DEFENDANT: No, sir.

THE COURT: All right. Is it your desire to withdraw your plea of guilty as to each one of these cases?

THE DEFENDANT: No, sir, I didn't understand.

14

THE COURT: All right. I'll put it this way: You told me you were guilty on each one?

THE DEFENDANT: Yes, sir.

THE COURT: I said I would accept that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you want anything to change about that?

THE DEFENDANT: No, sir.

THE COURT: Okay. You're telling me that your answers today, because they're the truth and not just because you think that's what I want to hear; is that right?

THE DEFENDANT: Yes, sir.

THE COURT: And if you had another answer, you would give it to me; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You need any time to talk to your lawyer—any more time to talk about those things?

THE DEFENDANT: No, sir.

THE COURT: All right. Thank you. You may be seated.

Until this point, the dialogue between the trial court and Thomas was straightforward; Thomas erred once in a response but corrected himself. But immediately after this point, the dialogue—although apparently over—resumed, meandered, twisted, and turned:

[DEFENSE COUNSEL]: Judge, Mr. Thomas wanted to address you.

THE COURT: Sorry?

15

[DEFENSE COUNSEL]: Mr. Thomas wanted to address you.

THE COURT: Yes.

THE DEFENDANT: On the advice of my attorney, I would like to withdraw those pleas and go to a jury trial, sir.

THE COURT: Pardon me?

THE DEFENDANT: I would like to—

[DEFENSE COUNSEL]: Is that what you want to do?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Withdraw the plea?

THE DEFENDANT: Yes, sir.

THE COURT: Let me ask you this: Do you stand on your waiver of a jury trial for each case?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

[DEFENSE COUNSEL]: If that's what he wants to do, Your Honor, he knows what he's doing now, unlike a few months ago he didn't.

THE COURT: Okay. So all the questions I've just asked you about these four waivers of jury trial, and the answers you gave me today, you're good with?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. But what you're telling me is that you do not desire to enter a plea of guilty, however, to each one of these cases, correct?

THE DEFENDANT: Yes, sir.

THE COURT: And, therefore, do you enter any other plea with regard to each one of these cases?

16

THE DEFENDANT: Not guilty, Your Honor.

THE COURT: All right. Are you telling me that voluntarily?

THE DEFENDANT: Yes, sir.

THE COURT: You want to address the Court?

[PROSECUTOR]: I do, Judge, if it's okay. I certainly think the Court's well aware that allowing a defendant to withdraw a guilty plea is a decision that the Court has in its discretion. We would urge the Court not to permit him to change his plea after we've actually had the entire trial, had him testify, received evidence, spent, basically, the whole day here hearing this case to go ahead and do that after closing argument.

Frankly, I think that that's, I guess, just his effort to get himself a new trial when, perhaps, things didn't go his way. He knew what he was doing before, which is what he told the Court then, which is what he told the Court today, and, basically, going to have to put us into a situation where we'll have to go through the whole case all over again where he's already had an opportunity for a preview of what the State's case is going to be, a transcript of what the officer is going to say just because he changed his mind. I would suggest and encourage the Court not to.

THE COURT: Okay. Do you take any issue with the proposition that the Court could ultimately make a finding of guilt based on the evidence heard today, nonetheless?

[PROSECUTOR]: Judge, I think—I'm not sure on that, to be honest. Judge, I can tell you, we didn't—we didn't prepare and pursue our case like we would if we were having a regular trial. So, you know, there may be some things we didn't—we didn't come through with that we ordinarily would if we were trying this on guilt/innocence. And I know we would have other evidence that we—evidence before the Court to secure that verdict. So I haven't really looked at this case from the perspective of what did we present from a guilt/innocence case, so I would be reluctant to tell the Court that that's a good idea at this particular point.

I think the evidence is clear, he meant to plead guilty a month ago. He meant to plead—he meant to do this and—

THE COURT: Proceed under that today, yes, sir.

[PROSECUTOR]: All the way after the closing argument and after the first colloquy with the court.

THE COURT: Yes, sir. Anything you want to say to that?

[DEFENSE COUNSEL]: Your Honor, I do believe you can make those findings on one or any of those cases, even after withdrawing, because it was done in open court.

THE COURT: You may be seated. The Court denies the request for withdrawal of the plea, therefore, does not withdraw its previous exception—acceptance of the plea with regard to each case. And based upon the Court's inquiry of the defendant today, as well as in February when the original entry of the pleas was made, determines those to be freely and voluntarily and knowingly given, thus satisfying the Court's intention to confirm that by its inquiry today.

Viewing the evidence in the light most favorable to the trial court's ruling, we hold that the evidence supports the trial court's finding that Thomas's pleas were voluntary. The above dialogue shows that moments before the trial court pronounced Thomas's punishments, it wanted to verify that Thomas wished to proceed with his guilty pleas, and Thomas—despite one hiccup—succeeded in persuading the trial court that he did. After the trial court had instructed Thomas to sit down, for reasons the record does not contain, Thomas then awkwardly tried to change his plea. But a change of mind does not render a plea involuntary if it was originally voluntary. *See Briggs v. State*, 560 S.W.3d 176, 178, 190–91 (Tex. Crim. App. 2018). Based on both the February and March hearings, Thomas's pleas were voluntary. We overrule Thomas's second point.

18

Similarly, viewing the evidence in the light most favorable to the trial court's ruling, we hold that the evidence supports the trial court's implied finding that Thomas was competent—that Thomas had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and had a rational as well as factual understanding of the proceedings against him. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a). Thomas understood the proceedings and attempted—although clumsily—to change his plea at the last moment.[3] We overrule Thomas's third point.

## Conclusion

Having overruled Thomas's three points, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 19, 2019

---

[3]Thomas's competence to stand trial was not an express issue at either the February or March 2019 hearing, but his competence was enough of a concern that the trial court had him evaluated. At the March 2019 hearing, the trial court admitted into evidence and took judicial notice of a December 2018 "Report of Competency to Stand Trial Evaluation" in which Thomas was found competent.